IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | CASE NO.: CR11-0050 |
| ROLANDO SANDOVAL TOVAR, | ) | |
| Defendant. | ) | |

### TOVAR'S NOTICE OF EXPERT WITNESSES

COMES NOW the Defendant, Rolando Sandoval Tovar, in the above-styled criminal cause, by and through his undersigned counsel, Latisha V. Colvin and Carlos A. Williams, and hereby provides notice, pursuant to Fed. R. Crim. Pro. 16 (b)(1)(C), of his intent to call Dr. Cameron Lippard and Dr. Howard Campbell as expert witnesses at trial. Both witnesses were qualified before the jury panel at jury selection on August 1, 2011. As grounds in support thereof, Tovar shows the following:

1. **Facts and Procedural Posture**

On February 7, 2011, at approximately 3:00 in the morning, Rolando Sandoval Tovar, a 57-year-old Mexican legal permanent resident, was stopped a short distance from the Alabama-Mississippi state line on eastbound Interstate 10. Alabama State Trooper Shone Minor stopped Tovar for touching the fog and center line and not wearing a seatbelt. He was the driver and lone occupant of the truck. Law enforcement record searches conducted by Trooper Minor during the stop revealed that Tovar was traveling with a valid Texas driver's license and a legal permanent

1

resident card, confirming his legal presence in the United States. He did not provide a false name or alias to Trooper Minor. Further inquiry revealed that he had no criminal history or outstanding warrants. Additionally, it was confirmed that his vehicle, a 1995 Ford-250, was properly registered to him in his name; had both valid license tags in his name on the front and back of the vehicle, as required by Texas law; that it had valid insurance in his name; and that it was neither stolen nor a rental vehicle. Present in the truck were three paint-stained painter's coveralls, several changes of clothes and toiletries, and other personal effects of Tovar's.

Following the completion of the traffic stop, Trooper Minor requested Tovar's permission to search the truck. Although Tovar speaks limited English and Trooper Minor is not fluent in Spanish, Tovar granted consent to search verbally and by executing a Spanish-language *Miranda* waiver. During the search, Trooper Minor stated that he observed several tool marks and dust disturbances under the truck's hood and near the engine area. No mechanic's tools were in Tovar's truck. Because the contraband was not detectable using the human sense of smell, the troopers deployed a drug-sniffing canine which alerted on the front of the truck. The troopers had to utilize a fiber optic scope to gain access into the engine manifold area because the contraband was not detectable with the human eye alone. With the use of the scope, the troopers were able to see something in the engine manifold area.

After a couple of hours on the side of the road, with Tovar seated in the front passenger seat of the trooper car, the officers transported the truck to a garage at the TA Truck Stop, which was off of the next exit. For the next hour or two, Tovar was placed in a chair in the garage while several troopers attempted to locate the item in the engine's natural void. After an extensive search, they were able to remove a large package wrapped in black tape from the void. The package was

determined to contain cocaine, and it weighed 2.2 kilograms. Tovar denied all knowledge of what the troopers had found. DEA Taskforce Agent David Fagan responded to the scene and took possession of the drug evidence.

On February 7, 2011, Tovar was arrested on a criminal complaint, [Doc. No. 1], then subsequently was indicted in the Southern District of Alabama for a single count of knowing possession of more than 500 grams of cocaine with the intent to distribute same. [Doc. No. 13]. If convicted, he faces a mandatory minimum five-year sentence. [Doc. No. 13-1]. On June 13-14, 2011, the first trial of this matter was held. After the presentation of all evidence and argument, a mistrial was declared, based on a hung jury. [Doc. No. 33]. The case is set to be re-tried before this Honorable Court on August 22, 2011.

2.   In the first trial, the government characterized Tovar's description of his trip from his home in Hidalgo, Texas, to a painting job in Atlanta, Georgia, that he was traveling to at the time of the traffic stop, as implausible. It argued that because Tovar did not possess specific details about the job or for whom he would be working in Atlanta, it provided circumstantial evidence of his guilty knowledge that he was transporting 2.2 kilograms of cocaine hidden deep inside of the engine manifold area of the 1995 Ford-F250 pickup truck that he had just purchased three weeks prior. The government also characterized as implausible the fact that a drug dealer would entrust to an unknowing drug courier, or "blind mule", $60,000 worth of cocaine to be delivered across the U.S./Mexican border and into the United States.

3.   **Legal Authority**

To address the arguments raised by the government, Tovar intends to offer the expert testimony of (1) Dr. Cameron Lippard, with regard to Mexican laborer travel norms; and (2) Dr.

industry or even more generally, for most working- and middle class citizens in the U.S. Often, people find themselves moving from place-to-place to find a better life or at least something similar to what they lost. In fact, I contend that my research on Latino immigrant social integration and labor patterns confirms what several social scientists have found before researching immigration patterns; immigrants travel thousands of miles to America to primarily seek out better opportunities that were only fueled by hopes, dreams, and little else."

Second, pursuant to Fed. R. Crim. Pro. 16 (b)(1)(C), Dr. Lippard, an Associate Professor of Sociology at Appalachian State University in Boone, North Carolina, states his qualifications in the following written summary:

"In 2004 and 2006, I received my Master's and Doctoral degrees from Georgia State University (GSU) in Atlanta, Georgia. During my studies at GSU, I examined race and ethnic relations with an emphasis on U.S. immigration patterns and changes. This particular focus led to a research dissertation that examined the various racial and ethnic differences of entrepreneurship, labor force management (e.g., hiring practices), and labor market patterns within the Atlanta construction industry. This study was conducted from 2004 to 2006 using an ethnographic approach that included in-depth interviews and participant observation with a number of Black, White, and Latino construction business owners and their employees. During this research, I was exposed to the customs and conditions of the industry within the guise of how various racial and ethnic groups were treated as business owners and employees."

**B.   Dr. Howard Campell**

First, pursuant to Fed. R. Crim. Pro. 16 (b)(1)(C), a written summary of Dr. Howard Campbell's expected testimony follows:

6

"**Valuation of Cocaine**

The value of cocaine hydrochloride (or simply "cocaine") in illicit markets varies considerably depending on quantity, purity, and geographic location. Various law enforcement and other government agencies (including the DEA, UN, and Mexican government) maintain detailed pricing data; additionally, media outlets and academics acquire and disseminate valuation information. These data vary but the general trend of the data is quite clear. The vast majority of cocaine trafficked in the U.S. originates in the Andes region of Bolivia, Peru, and Colombia. Farmers are paid $80 for a bundle of leafs from a two-acre field. *Chagra*, a preliminary chemical process, yields uncultivated *base* (paste), worth $500 to $800 per kilogram. After passing through a crystallizing laboratory, representatives of Mexican trafficking syndicates in South America pay between $1,500 and $2,500 per kilogram for a brick of pure, powder cocaine. Risks associated with transportation generate price increases as the product moves toward its target market. Prices reach $4,000 in Panama and $6,000 in Guatemala. In Mexico, powder cocaine in bulk quantities is valued at between $8,000 and $12,500 per kilogram, and retails at $20 to $40 per gram. The same cocaine starts at $15,000 in El Paso, TX; Tucson, AZ; and Los Angeles, CA to as much as $39,000 in points north in the states of Massachusetts, Pennsylvania, and Ohio. At the gram level, it retails for $35 in border cities—or more in small or mid-size border communities—and for $175 in points further north and east. Although there are generally price increases as cocaine is transported north and east in the U.S., proximity to distribution hubs (such as Chicago or Atlanta) can mitigate these increases. Cocaine may be diluted or "cut" by mid-level distributors and street dealers. Common adulterants include flour, quinine, baking powder, talcum powder, baby laxative, and lactose. Adulteration increases weight and price; nevertheless, price increases may be tempered by

diminished purity. Notwithstanding reduced purity, cocaine generally increases in value as it travels north from Latin America to the U.S. (and as it continues north and east within the U.S.) because of increased risk of detection and interdiction by sophisticated U.S. law enforcement tactics and technology. Moreover, cocaine's market utility in the U.S. results from: 1) proximity to the primary consumer base and 2) the accumulated risk exposure, a consequence of transportation over sizable distances.

**Mexican Labor Relations**

When Mexican workers are sent to the U.S. on work-related business they bring with them specific culturally-rooted customs, behaviors, and attitudes. Mexican people rely heavily on social ties to recruit laborers and enforce work discipline. Mexicans underutilize institutions to obtain employment, particularly outside densely populated urban areas. Instead, jobs are secured through networks comprised of family members and other personal contacts. These social networks and customs are forged and maintained through tight interpersonal relationships and are determined by socioeconomic status, family background, and place of origin. In general, work-related activities and relationships are bound by custom, ritual and personalism rather than abstract norms and rules. For centuries Mexican culture has been characterized by vertical, authoritarian, and autocratic structures in the economic, political, social, and professional spheres. Consequently, employment environments tend to be hierarchical and rigidly-structured. Employers feel little compulsion toward transparency and open communication with workers. Employees' questions and critiques are not rewarded. Although there is regional and industry variation, workers—particularly in jobs perceived as low status, such as truck drivers—tend to be given little information with which to perform work related duties. It would not be uncommon for a worker

to be instructed to do a job without being given complete details up front about the work itself and what it entailed. Often, workers are told they will receive more details at a later date. Questioning employers or other superiors in the workplace would be considered inappropriate if not disrespectful. Thus, Mexican workers often have considerable ignorance about the work tasks they are expected to perform.

**Drug Cartels' Increasing Use of "Blind Mules"**

The techniques employed by Mexican traffickers of illicit drugs evolve with time. There is a tendency to increased sophistication, creativity, and dehumanization in the search to avoid detection by the increasingly effective U.S. law enforcement effort. One technique that has recently become wide-spread involves planting drugs in or fixing them to vehicles, unbeknownst to vehicle operators. "Mule" is the traditional term for a low-level contraband runner. The technique described allows drug traffickers to prey on unknowing "blind mules:" people not complicit in the smuggling operation. Traffickers' modus operandi vary, but through a spate of recent prosecutions—including several in Ciudad Juárez affecting people I personally interviewed—basic patterns have emerged. First, traffickers select targets based on knowledge of driver movements. They employ lookouts to observe unsuspecting potential targets. The lookouts, in turn, pass intelligence to traffickers. Once a target is selected, drugs are carefully planted in concealed areas of the vehicle such as the engine housing, upholstery or the undercarriage. For short runs over the border, drugs are frequently placed in duffle bags in the trunk. To plant drugs, duplicate keys may be made, utilizing the vehicle identification number. If the one planting the package attains access to the vehicle through other means—such as being a mechanic or detailer of the vehicle—then a duplicate key isn't necessary. Finally, when drugs are planted, traffickers then

9

employ persons to pick up the drugs at a final destination, accessing the vehicle without the driver's knowledge or simply coercing the driver to provide access. There are several advantages to using blind mules. As mentioned above, the novelty of this form of deception helps avoid detection by U.S. law enforcement (who have made great strides in recent years to prevent drug trafficking across the U.S.-Mexico border). Also, this transport method reduces costs, as the driver is not paid.. Lastly, traffickers at higher levels of the cartel chain run less risk of apprehension; if the driver is detained, he or she has no knowledge of the identity of the involved traffickers."

Second, pursuant to Fed. R. Crim. Pro. 16 (b)(1)(C), Dr. Campbell, a Professor of Sociology and Anthropology at the University of Texas-El Paso in El Paso, Texas, states his qualifications in the following written summary:

"I am a professor of cultural anthropology at the University of Texas at El Paso with more than 25 years of research experience in Mexico and along the U.S.-Mexico border. Cultural anthropology is the study of contemporary human cultures. Anthropologists research culture from a holistic, cross-societal perspective that emphasizes the similarities and differences within and between societies. Anthropologists also examine the interconnections among various dimensions of culture including economics, kinship systems and family life, and politics. I received my B.A. in anthropology in 1980 from the University of Idaho. I received an M.A. in Ibero-American Studies from the University of Wisconsin in 1984. I received a second M.A. (in anthropology) in 1985 and my Ph.D. (anthropology) in 1990 from the University of Wisconsin.

I have published more than twenty peer-reviewed journal articles and numerous essays, book reviews, and scholarly reports. I have presented approximately 30 scholarly papers at

national and international conferences. I have received research and/or travel grants from numerous federal and state government foundations and universities, including from the National Endowment for the Humanities, the National Science Foundation, the Inter-American Foundation, the University of Texas, the Texas Commission for the Humanities, and the Texas Higher Education Coordinating Board. I have served on the editorial board of one scholarly journal (Journal of Latin American Anthropology) and one university press (University of Texas Press) in my field. I have conducted research in rural and urban Mexico since 1984 and on the U.S.-Mexico border since 1991. Additionally, I have done extensive research on Mexican-American culture.

I am the author of five volumes about Mexico and an award-winning book (published October 2009) from the University of Texas Press called *Drug War Zone*. The book is concerned with the drug trade in Mexico and on the U.S.-Mexico border. I have prepared affidavits or testified in approximately 20 cases concerned with Mexican immigrants to the U.S."

                                        Respectfully Submitted,

                                        s/ Latisha V. Colvin
                                        Latisha V. Colvin (COLVL9139)

                                        s/ Carlos A. Williams
                                        Carlos A. Williams (WILLC9821)
                                        Federal Defenders Organization, Inc.
                                        11 North Water Street, Suite 11290
                                        Mobile, AL 36602
                                        (251) 433-0910 (telephone)
                                        (251) 433-0686 (facsimile)

                                        Attorneys for Rolando Sandoval Tovar

**CERTIFICATE OF SERVICE**